# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-00891-MSK

WILDEARTH GUARDIANS, a non-profit organization,

CENTER FOR BIOLOGICAL DIVERSITY, a non-profit organization,

      Petitioners,

 v.

JASON SUCKOW, in his official capacity as the Director of the U.S. Department of Agriculture's Animal and Plant Health Inspection Service – Wildlife Services' Western Region,

ANIMAL AND PLANT HEALTH INSPECTION SERVICE-WILDLIFE SERVICES, a federal program, and

UNITED STATES DEPARTMENT OF AGRICULTURE, a federal department,

      Federal Respondents.

---

## PETITIONERS' OPENING BRIEF ON THE MERITS

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................iii

INTRODUCTION...............................................................................................................1

JURISDICTION AND STANDING ....................................................................................2

STANDARD OF REVIEW..................................................................................................5

BACKGROUND..................................................................................................................6

    I.     Wildlife Services' Predator Damage Management Program in Colorado ................6

    II.    The National Environmental Policy Act ........................................................................8

ARGUMENT

    I.     Wildlife Services failed to take a "hard look" at the impacts of its predator
         damage management program in Colorado ................................................................9

         a.    Wildlife Services failed to adequately disclose, consider, and analyze the
              efficacy of lethal predator damage management................................................11

         b.    Wildlife Services failed to adequately disclose, consider, and analyze the
              impact of increased oil and gas and residential development in mule deer
              habitat......................................................................................................................15

         c.    Wildlife Services relied on inaccurate data and misled the public on its
              scientific findings relating to black bears in Colorado ....................................22

         d.    Wildlife Services relied on unsupported coyote population estimates...........23

    II.    Wildlife Services failed to provide a convincing statement of reasons to justify
         its decision to forego preparation of an Environmental Impact Statement...........25

         a.    Wildlife Services' proposed actions contemplate significant impacts
              such that an EIS is required ................................................................................28

         b.    Wildlife Services' proposed actions may affect public health and safety
              in Colorado............................................................................................................30

c.    Wildlife Services' proposed actions would be implemented in areas with unique characteristics, including ecologically critical areas ..............................31

d.    Wildlife Services' proposed actions would have highly controversial and highly uncertain effects, and involve unique and unknown risks ..................33

e.    Wildlife Services' proposed actions may have an adverse effect on threatened or endangered species ......................................................................36

CONCLUSION ..........................................................................................................................37

CERTIFICATE OF COMPLIANCE ........................................................................................39

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Evans,*
371 F.3d 475 (9th Cir. 2004) ..................................................................................27

*Blue Mountains Biodiversity Project v. Blackwood,*
161 F.3d 1208 (9th Cir. 1998) ...............................................................................26

*Calvert Cliffs Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n,*
449 F.2d 1109 (D.C. Cir. 1971) ...............................................................................9

*Cascadia Wildlands v. Forest Service,*
937 F. Supp. 2d 1271 (D. Or. 2013) .......................................................................27

*Cascadia Wildlands v. Woodruff,*
151 F. Supp. 3d 1153 (W.D. Wash. 2015) ..............................................................34

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971) .................................................................................................5

*Citizens' Comm. to Save Our Canyons v. Krueger,*
513 F.3d 1169 (10th Cir. 2008) ...............................................................................9

*Colo. Envtl. Coal. v. Dombeck,*
185 F.3d 1162 (10th Cir. 1999) ...............................................................................8

*Comm. to Save Rio Hondo v. Lucero,*
102 F.3d 445 (10th Cir. 1996) ........................................................................ 2, 3, 4

*Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.,*
538 F.3d 1172 (9th Cir. 2008) ...............................................................................27

*Custer Cnty. Action Ass'n v. Garvey,*
256 F.3d 1024 (10th Cir. 2001) ...............................................................................8

*Dine Citizens Against Ruining our Env't v. Klein,*
747 F. Supp. 2d 1234 (D. Colo. 2010) .............................................................. 8, 26

*Hunt v. Wash. State Apple Advertising Comm'n,*
    423 U.S. 333 (1977) ...................................................................................................3

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ...................................................................................................4

*Middle Rio Grande Conservancy Dist. v. Norton,*
    294 F.3d 1220 (10th Cir. 2002) ...........................................................................26, 33

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ...............................................................5, 15, 21, 23, 24, 25

*Native Ecosystems Council v. U.S. Forest Serv.,*
    428 F.3d 1233 (9th Cir. 2005) ...................................................................................33

*New Mexico ex rel. Richardson v. U.S. Bureau of Land Mgmt.,*
    565 F.3d 683 (10th Cir. 2009) ...................................................................................5

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
    402 F.3d 846 (9th Cir. 2005) ....................................................................................26

*Olenhouse v. Commodity Credit Corp.,*
    42 F.3d 1560 (10th Cir. 1994) ....................................................................................5

*Or. Natural Desert Ass'n v. Bureau of Land Mgmt.,*
    625 F.3d 1092 (9th Cir. 2010) ....................................................................................9

*Or. Wild v. U.S. Bureau of Land Mgmt.,*
    No. 6:14-cv-0110-AA, 2015 WL 1190131 (D. Or. Mar. 14, 2015) ..............................35, 36

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ...................................................................................................8

*San Juan Ecosystem Council v. U.S. Forest Service,*
    No. 04-cv-01071-MSK, 2007 WL 1463855 (D. Colo. May 17, 2007) ..........................27, 28

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947) ...................................................................................................5

*Sierra Club v. U.S. Fish and Wildlife Serv.,*
    235 F. Supp. 2d 1109 (D. Or. 2002) ....................................................................28, 29, 36

*Town of Superior v. U.S. Fish and Wildlife Serv.,*
    913 F. Supp. 2d 1087 (D. Colo. 2012) ...................................................................33

*Western Watersheds Project v. USDA APHIS Wildlife Services,*
    320 F. Supp. 3d 1137 (D. Idaho 2018) ........................................ 12, 15, 32, 34, 36

*WildEarth Guardians v. Conner,*
    920 F.3d 1245, 1262 (10th Cir. 2019) ..................................................................27

*WildEarth Guardians v. Nat'l Park Serv.,*
    703 F.3d 1178 (10th Cir. 2013) ..............................................................................5

**Statutes**

5 U.S.C. § 701 ....................................................................................................................2

5 U.S.C. § 706 .................................................................. 2, 5, 15, 21, 23, 25, 28, 37

16 U.S.C. § 1131(c) ..........................................................................................................32

28 U.S.C. § 1331 ................................................................................................................2

28 U.S.C. § 1391(e) ...........................................................................................................2

28 U.S.C. § 2201 ................................................................................................................2

28 U.S.C. § 2202 ................................................................................................................2

42 U.S.C. § 4321 ................................................................................................................2

42 U.S.C. § 4332(2)(C) .................................................................. 10, 15, 21, 23, 25, 26

**Regulations**

40 C.F.R. § 1500.1(a) .......................................................................................................8

40 C.F.R. § 1500.1(b) ...........................................................................................9, 10, 15

40 C.F.R. § 1500.1(c) .......................................................................................................9

40 C.F.R. § 1501.2 ....................................................................................................10

40 C.F.R. § 1502.5(a) ..............................................................................................10

40 C.F.R. § 1502.14(a) ............................................................... 10, 15, 21, 23, 25

40 C.F.R. § 1502.16 ..................................................................... 10, 15, 21, 23, 25

40 C.F.R. § 1502.22(b)(4) .......................................................................................10

40 C.F.R. § 1502.24 ................................................................................... 10, 15

40 C.F.R. § 1508.7 ....................................................................... 10, 15, 21, 23, 25

40 C.F.R. § 1508.8 ....................................................................... 10, 15, 21, 23, 25

40 C.F.R. § 1508.14 ..................................................................... 10, 15, 21, 23, 25

40 C.F.R. § 1508.27 ..................................................................................................26

40 C.F.R. § 1508.27(a) ............................................................................................26

40 C.F.R. § 1508.27(b) ............................................................................................27

40 C.F.R. § 1508.27(b)(1) ........................................................... 28, 29, 32, 36

40 C.F.R. § 1508.27(b)(2) ........................................................................... 30, 31

40 C.F.R. §1508.27(b)(3) ............................................................................ 31, 32

40 C.F.R. § 1508.27(b)(4) ........................................................................... 33, 36

40 C.F.R. § 1508.27(b)(5) ........................................................................... 33, 36

40 C.F.R. § 1508.27(b)(7) ........................................................................... 28, 29

40 C.F.R. § 1508.27(b)(9) ........................................................................... 36, 37

# INTRODUCTION

Petitioners WildEarth Guardians and Center for Biological Diversity (collectively "Guardians") respectfully file this opening brief in support of its First Amended Petition for Review of Agency Action. ECF No. 26. This case concerns Federal Respondents Jason Suckow, Animal and Plant Health Inspection Service-Wildlife Services, and U.S. Department of Agriculture's (collectively "Wildlife Services'") decision to continue its status-quo program of lethal predator damage management in the State of Colorado to unnecessarily kill thousands of native wildlife in the absence of proper disclosure and consideration of the environmental effects of its actions as mandated by federal law.

Guardians respectfully requests the Court declare Wildlife Services violated the National Environmental Policy Act ("NEPA"), its implementing regulations, and the Administrative Procedure Act ("APA") in analyzing and authorizing Predator Damage Management in Colorado via an Environmental Assessment ("EA"), AR00001,[1] and Decision Notice and Finding of No Significant Impact ("DN/FONSI"), AR000460. Guardians further respectfully requests that the Court vacate the EA and DN/FONSI as required by the APA.[2]

---

[1] Documents in the Administrative Record, ECF No. 28, are cited to as AR***, and documents in the Supplement to the Administrative Record, ECF No. 32, are cited to as S***. Guardians omits the "WS" prefix included in the Bates stamping on the Administrative Record documents.

[2] Pursuant to D.C. COLO.LCivR 7.1(a), counsel for the parties have conferred by phone and via email regarding the claims in this case, but have been unable to resolve their differences.

## JURISDICTION AND STANDING

Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 (federal question) and § 2202 (declaratory relief). This cause of action arises under the laws of the United States, including the APA, 5 U.S.C. § 701 *et seq.*, and NEPA, 42 U.S.C. § 4321 *et seq.* An actual, justiciable controversy exists between Guardians and Wildlife Services. The requested relief is proper under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. § 706. Venue is proper in this Court under 28 U.S.C. § 1391(e), because Wildlife Services resides in this judicial district, and a substantial part of the events or omissions giving rise to this litigation occurred in Colorado. Guardians submitted timely comments on a draft version of the EA at issue in this litigation. AR44079, AR43804.

WildEarth Guardians and Center for Biological Diversity have standing to challenge Wildlife Services' Colorado Predator Management EA and DN/FONSI. To establish Article III standing, Petitioners must show: (1) that its members have suffered "'injury in fact' – an invasion of a legally protected interest which is 'concrete and particularized' and 'actual or imminent;'" (2) a "causal connection … exist[s] between the injury and the conduct complained of;" and (3) that it is "likely that the injury will be redressed by a favorable decision." *Comm. to Save Rio Hondo v. Lucero*, 102 F.3d 445, 447 (10th Cir. 1996) (internal citations omitted).

An organizational plaintiff has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to

protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advertising Comm'n*, 423 U.S. 333, 343 (1977).

In NEPA cases, a plaintiff satisfies the injury in fact requirement by showing: (1) the alleged NEPA violation creates an increased risk of environmental harm and that such increased risk is to the plaintiff's concrete interests; and (2) the plaintiff has a geographical nexus to or actual use of the area of the agency action. *Comm. to Save Rio Hondo*, 102 F.3d at 449. "To establish causation, a plaintiff need only show its increased risk is fairly traceable to the agency's failure to comply with [NEPA]." *Id.* at 451. Redressability exists if "it is likely … that the injury will be redressed by a favorable decision." *Id.* 452. Importantly, "a plaintiff need not establish that the ultimate agency decision would change upon [NEPA] compliance." *Id.*

In addition to Article III standing, a plaintiff must also establish that "it is 'adversely affected or aggrieved … within the meaning of a relevant statute' by some final agency action." *Id.* at 448 (internal citation omitted). In NEPA cases, a plaintiff "seek[ing] to protect its recreational, aesthetic, and consumptive interests in the land and water" has suffered injuries that "fall within the 'zone of interests' that [NEPA] was designed to protect." *Id.* (internal citation omitted).

Here, Petitioners meet these standards. Their members are directly harmed by Wildlife Services' violations of NEPA, and implementation of the Colorado Predator Damage Management Program would negatively impact numerous interests their members

have in Colorado. *See* Nichols Decl. ¶¶ 3, 5; Jones Decl. ¶ 12; Ukeiley Decl. ¶ 22; Malone

Decl. ¶ 23. Wildlife Services' failure to conduct a lawful and complete NEPA analysis

created an increased risk of environmental harm through uninformed decision-making, and

this harm would be redressed by a decision requiring Wildlife Services to comply with

NEPA. Nichols Decl. ¶ 17; Jones Decl. ¶ 12; Ukeiley Decl. ¶¶ 22, 24; Malone ¶ 23. Further,

their members regularly recreate in areas where predator damage management has and may

be implemented, and do so for recreational, aesthetic, scientific, and spiritual purposes, and

have plans to do so in the future. Nichols Decl. ¶ 2; Jones Decl. ¶ 10; Ukeiley Decl. ¶¶ 16,

18; Malone ¶ 4. While recreating in these areas, Petitioners' members enjoy attempting to

observe a variety of wildlife, including black bears, coyotes, and cougars. Nichols Decl. ¶ 14;

Jones Decl. ¶ 4; Ukeiley Decl. ¶¶ 16, 19; Malone ¶¶ 6, 19. These interests in the project area

fall within the "zone of interests" that NEPA was designed to protect. *See Comm. to Save Rio

Hondo*, 102 F.3d at 448. Wildlife Services' decision also injures Petitioners' members by

decreasing the likelihood that they will see such wildlife in the wild in the future in Colorado.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–63 (1992) ("the desire to use or observe an

animal species, even purely for esthetic purposes, is undeniably a cognizable interest for

purpose of standing"). Finally, Petitioners can pursue this case on behalf of their members

because their members have standing, the claims are germane to its organizational purposes,

and individual members are not required to participate. *See* Nichols Decl. ¶ 2; Jones Decl. ¶

2; Ukeiley Decl. ¶ 3; Malone Decl. ¶ 2; *see also Comm. to Save Rio Hondo*, 102 F.3d at 447 n. 3.

**STANDARD OF REVIEW**

The APA governs judicial review of agency action under NEPA. *New Mexico ex rel. Richardson v. U.S. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009). Under the APA, "[t]he reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1182–83 (10th Cir. 2013). This review requires a court to "determine whether the agency considered all relevant factors and whether there has been a clear error of judgment." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994). Accordingly, agency action will be set aside if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A reviewing court may not "supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Instead, "[a]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* at 50. The arbitrary and capricious standard is deferential, but it does not "shield" agency decisions from a "searching and careful," "thorough, probing, and in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).

## BACKGROUND

**I.      Wildlife Services' Predator Damage Management Program in Colorado.**

Wildlife Services is a federal program within the U.S. Department of Agriculture's

Animal and Plant Health Inspection Service that conducts predator damage management

(or, predator control) throughout Colorado. AR000009. Wildlife Services' predator control

work includes killing native wildlife, including (but not limited to) black bears, mountain

lions, coyotes, red foxes, and other native carnivores upon the request of primarily

agricultural interests and state wildlife departments in an effort to reduce human/livestock

conflict and assist with research relating to wildlife coexistence. AR000009–11. In Colorado,

Wildlife Services uses shooting (including aerial shooting from helicopters and airplanes),

trapping, snaring, and poisoning via sodium-cyanide M-44 devices and large gas cartridges to

kill native wildlife. AR 000463. While a number of non-lethal predator control techniques are

available to Wildlife Services — such as using noise/scare devices to keep predators away

from livestock, placing fladry (strips of flagging hanging from a fence-line) to keep canids

out of a designated area, employing range riders, and exercising husbandry practices that

encourage coexistence (such as changing the timing  and location of birthing seasons to

reduce conflict) —  the program primarily relies on requesters themselves to implement such

tactics. AR000010; AR 000019.

Wildlife Services' predator control program in Colorado also contemplates killing

large numbers of native black bears and cougars at the request of Colorado Parks and

Wildlife in order to assist with the implementation of two highly controversial study plans:

(1) *Addressing Neonate Mule Deer Survival in the Piceance Basin*, AR000425–36 (EA, Appendix G),

and (2) *Mule Deer Population Response to Cougar Population Manipulation*, AR000437–59 (EA,

Appendix H). AR000059. In the first of these studies, researchers are assessing the impact of

increased predator control on newborn mule deer survival rates. AR000427. Increased

predator control will be achieved by dramatically increasing the killing of native black bears

and mountain lions within the project area. *Id.* In the second study, researchers are seeking

information on the effects of drastically reducing the mountain lion population on the

region's overall mule deer population. AR000439. Importantly, neither of these studies

consider the potential impacts of increased habitat destruction from oil and gas and

residential development as a factor in reducing newborn mule deer survival rates and overall

population estimates, and instead seek only to target native black bears and mountain lions

as the probable source of any alleged decline. *See* AR07864–65; AR047858–047863

(newspaper articles describing the Colorado Parks and Wildlife studies and the ignored

effects of increased oil and gas development on mule deer population levels); AR07855

(newspaper article suggesting "[Colorado Parks and Wildlife] and [Wildlife Services] may be

planning to use their lion- and bear-killing predator control plans in the Piceance Basin,

where the cumulative activities of the oil and gas industry are a primary impact on deer

populations, as a faulty justification for establishing an agency policy of killing even more

lions and bears in other areas of Colorado in the name of boosting mule deer numbers.").

Wildlife Services may lend assistance in the immense slaughter dictated by these "study

plans" as part of the predator damage management program analyzed in the EA at issue here. AR000059.

## II.  The National Environmental Policy Act.

NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA "'prescribes the necessary process' by which agencies must take a 'hard look at the environmental consequences of proposed actions utilizing public comment and the best available scientific information;' it 'does not mandate particular results.'" *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1034 (10th Cir. 2001) (quoting *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1171–72 (10th Cir. 1999)). While "[o]ther statutes may impose substantive environmental obligations on federal agencies … NEPA merely prohibits uninformed — rather than unwise — agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989). However, "focusing the agency's attention on the environmental consequences of a proposed project … ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast …. Moreover, the strong precatory language of § 101 of [NEPA] and the requirement that agencies prepare detailed impact statements inevitably bring pressure to bear on agencies 'to respond to the needs of environmental quality.'" *Id.* (citing 115 Cong. Rec. 40425 (1969) (remarks of Sen. Muskie)).

NEPA's "procedural requirements are not merely formalities." *Dine Citizens Against Ruining our Env't v. Klein*, 747 F. Supp. 2d 1234, 1248 (D. Colo. 2010) ("*Dine CARE*"). "NEPA procedures must insure that environmental information is available to public

officials and citizens before decisions are made and before actions are taken." 40 C.F.R. §

1500.1(b).

> [B]y requiring agencies to take a 'hard look' at how the choices before them affect the environment, and then to place their data and conclusions before the public, NEPA relies upon democratic processes to ensure — as the first appellate court to construe the statute in detail put it — that the 'most intelligent, optimally beneficial decision will ultimately be made.'

*Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1099–1100 (9th Cir. 2010)

(quoting *Calvert Cliffs Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109,

1114 (D.C. Cir. 1971) (citation omitted)). "NEPA places upon federal agencies the obligation

to consider every significant aspect of the environmental impact of a proposed action. It also

ensures that an agency will inform the public that it has considered environmental concerns

in its decision-making process." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169,

1177–78 (10th Cir. 2008) (internal quotation and citations omitted). "Public scrutiny [is]

essential to implementing NEPA." 40 C.F.R. § 1500.1(b). "Ultimately, of course, it is not

better documents but better decisions that count. NEPA's purpose is not to generate

paperwork — even excellent paperwork — but to foster excellent action." 40 C.F.R. §

1500.1(c).

## ARGUMENT

## I.  Wildlife Services failed to take a "hard look" at the impacts of its predator damage management program in Colorado.

NEPA requires that Wildlife Services adequately disclose, consider, and analyze the

direct and indirect effects and cumulative impacts of its decision to conduct predator

damage management in Colorado. 42 U.S.C. §§ 4332(2)(C)(i)–(v); 40 C.F.R. §§ 1502.14(a), 1502.16, 1508.7, 1508.8, 1508.14. Direct effects are caused by the action and occur at the same time and place. 40 C.F.R. § 1508.8. Indirect effects are caused by the action and occur later in time or farther removed in distance, but are reasonably foreseeable. *Id.* Cumulative impacts are the impacts on the environment that result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. Wildlife Services is required to provide a hard look analysis of these impacts before there are "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(C)(v); *see also* 40 C.F.R. §§ 1501.2, 1502.5(a).

Under NEPA, Wildlife Services is required to ensure the professional integrity, including scientific integrity, of the discussions and analyses included in its NEPA document. 40 C.F.R. § 1502.24. Wildlife Services also has a duty to use "high quality" information and scientific analysis in its NEPA documents. 40 C.F.R. § 1500.1(b). Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. *Id.* Where information relevant to foreseeable adverse impacts is unavailable, agencies must nonetheless evaluate "such impacts based upon theoretical approaches or research methods generally accepted in the scientific community." 40 C.F.R. § 1502.22(b)(4). Wildlife Services may not rely on incorrect assumptions or data; fail to disclose scientific gaps and shortcomings in the data, literature, or models used; arbitrarily

select and criticize science; or mislead the public about various scientific findings and conclusions.

Here, Wildlife Services failed to take the requisite hard look NEPA demands by selecting its preferred alternative to continue and expand its predator damage management activities in Colorado for at least four reasons.

### a.   Wildlife Services failed to adequately disclose, consider, and analyze the efficacy of lethal predator damage management.

Wildlife Services' EA and DN/FONSI fail to take a hard look at a whole body of scientific literature and research questioning the efficacy of continuing a program of lethal predator damage management in Colorado in the modern era. The administrative record contains a number of recent, peer-reviewed scientific research articles authored by acclaimed professionals in the fields of conservation biology and wildlife management, and published in renowned academic and scientific journals, that Wildlife Services disregards as being based on mere "assumptions, opinions, and ideas." AR000466. While Wildlife Services characterizes these studies as being potentially "persuasive," the agency discounts them because they "may not be practical or effective," AR000467, or the information presented within allegedly does "not add substantively to the information and analyses" in the EA. AR000338–40. But the many studies discounted by Wildlife Services address the efficacy of using lethal means to control native predators, which pertains directly to the agency's analysis of its predator damage management program.

For example, in 2016, Dr. Adrian Treves *et al.* published a study finding serious flaws

in research projects designed to test the efficacy of lethal predator controls. AR039350–58

(Treves *et al.*, *Predator Control Should Not Be A Shot in the Dark* (2016)). As a result, Dr. Treves

*et al.* recommended a suspension "of predator control efforts that lack evidence for

functional effectiveness." AR039350, AR039356–57 ("Sound policy should be consistent

with law, scientific evidence, and ethical standards of society."). However, instead of

acknowledging the serious evidentiary deficiencies underlying Wildlife Services' methods of

lethal predator damage management in the EA, the agency merely states it does not agree

with Dr. Treves *et al.* and attaches an evaluation by its own scientists as a rebuttal.

AR000405–07. In a similar challenge to Wildlife Services' NEPA assessment of the impacts

of a predator damage management program in Idaho, the District of Idaho found the exact

same refutation to be insufficient to comply with NEPA.  As the court noted, the response

appears so biased that it "feels like equal parts personal attack and scientific rebuttal — it

does not so much convince the reader of the agency's position as cry out for more objective

review, the kind that could be done in an EIS." *Western Watersheds Project v. USDA APHIS

Wildlife Services*, 320 F. Supp. 3d 1137, 1149 (D. Idaho 2018). To once again, here, rely on the

same biased response to discount an entire body of science criticizing the agency's

continuance of its status quo killing regime violates NEPA's mandate that the agency take a

"hard look" at the impacts of its proposed action.

Dr. Treves *et al.* (2016) is not the only example of arbitrarily discounted science. As a

further example, a 2017 issue of the widely respected and scientifically peer-reviewed *Journal

of Mammalogy* contains at least three peer-reviewed articles discussing whether continuing

programs of lethal predator damage management are effective. AR015397; AR011865; and AR014901. But despite these studies' direct relevance to the subject-matter of its EA, Wildlife Services lists each of these articles under the category: "Documents not cited because they do not add substantively to the information and analyses in the EA." AR000338–40. This tactic is fundamentally flawed.

First, Dr. Bradley J. Bergstrom's article, entitled *Carnivore Conservation: Shifting the Paradigm from Control to Coexistence,* notes that a "consensus is emerging among ecologists that extirpated, depleted, and destabilized populations of large predators are negatively affecting the biodiversity and resilience of ecosystems," and that data is showing "that nonlethal methods of preventing depredation of livestock by large carnivores may be more effective, more defensible on ecological, legal, and wildlife-policy grounds, and more tolerated by society than lethal methods." AR015397. Dr. Bergstrom describes five reasons for replacing lethal control efforts — like the kind Wildlife Services deploys — with nonlethal means of wildlife conflict resolution, including: (1) the "potential disruption of top-down forcing and consequent loss of ecosystem resilience and biodiversity;" (2) the amount of "'bycatch' or unnecessary killing of nontarget species of mammals and other wildlife that occurs with nonselective methods of lethal control;" (3) the fact that the destruction of populations of certain wildlife valued by many parts of society is being conducted "for the benefit of a few favored interest groups;" (4) the "ineffectiveness of lethal control of predators at either reducing livestock depredation, or secondarily, enhancing game populations, over the long term;" and (5) "ethical considerations about both the intrinsic value of carnivores and

humane methods of killing them." AR015398.

Second, Stone *et al.'s* article, *Adaptive Use of Nonlethal Strategies for Minimizing Wolf-Sheep Conflict in Idaho*, finds that nonlethal predator damage management efforts work, in even a larger-scale public lands ranching context. AR011865. Stone *et al.'s* seven-year study "provides evidence that proactive use of a variety of nonlethal techniques applied conditionally can help reduce depredation on large open-range operations." AR011865. And third, Dr. Wallach *et al.'s* study, *Cattle Mortality on a Predator-friendly Station in Central Australia*, also dispels of the myth that lethal control is necessary to resolve livestock depredation issues. AR014901. Dr. Wallach *et al.* found that "[s]hifting from killing predators to improving husbandry standards" is more likely to improve livestock survival where the social stability of a predator population is allowed to increase upon elimination of lethal control efforts. AR014901. These studies provide but a few examples to show how Wildlife Services failed to adequately assess the environmental impacts of its lethal predator damage management program.[3]

Wildlife Service's approach of ignoring or discounting studies which do not support its desired outcome of continuing its regime of lethal predator control in Colorado does not

---

[3] *See also e.g.,* AR025057 (Bergstrom *et al., License to Kill: Reforming Federal Wildlife Control to Restore Biodiversity and Ecosystem Function* (2013)); AR045425 (Slagle *et al., Attitudes Toward Predator Control in the United States: 1995 and 2014* (2017)); AR015427 (Carter *et al., Co-Adaptation Is Key to Coexisting with Large Carnivores* (2016)); AR014480 (Treves *et al., Predators and the Public Trust* (2015)); S000169 (letter from scientists questioning efficacy of Colorado Parks and Wildlife predator control studies in the Piceance and Upper Arkansas Basins); S000179 (same).

satisfy NEPA's hard look requirement. *Western Watersheds Project,* 320 F. Supp. at 1148–49

("[U]nconvincing are the agency's attempts to explain away scientific challenges to the

effectiveness of predator removal."). By discounting relevant science, Wildlife Services

cannot "ensure the professional integrity, including the scientific integrity, of the discussions

and analyses included" in the EA. *See* 40 C.F.R. § 1502.24. Moreover, Wildlife Services'

reliance on old and outdated science does not satisfy its duty to use "high quality"

information in the EA.[4] *See id.* § 1500.1(b). This is the epitome of arbitrary and capricious

decision making disallowed by the APA and NEPA. 5 U.S.C. § 706(2)(A); 42 U.S.C. §§

4332(2)(C)(i)–(v); 40 C.F.R. §§ 1502.14(a), 1502.16, 1508.7, 1508.8, 1508.14; *Motor Vehicle

Mfrs. Ass'n*, 463 U.S. at 43.

> **b.** **Wildlife Services failed to adequately disclose, consider, and analyze the impact of increased oil and gas and residential development in mule deer habitat.**

Second, Wildlife Services failed to take a hard look at all of the factors causing alleged

mule deer population declines in Colorado. By deciding to continue its current program of

lethal predator damage management, Wildlife Services may respond to requests for services

from Colorado Parks and Wildlife to kill cougars and black bears under the auspices of

"scientific research" to assess the impacts of predator reduction on mule deer demographics.

AR000059; AR000111. By participating in these studies, Wildlife Services is choosing to

ignore key factors relating to habitat loss and fragmentation — and related nutritional

---

[4] *See* AR043804–09 (listing old and outdated science cited in the EA).

deficiencies — resulting from increased oil and gas development and increased human population expansion into mule deer habitat. *See e.g.* AR07864–65; AR047858–047863; AR07855 (newspaper articles describing the Colorado Parks and Wildlife studies and the ignored effects of increased oil and gas development on mule deer populations).

While acknowledging that assessing ungulate population declines is complex and may be based on the interrelation of myriad factors, AR000052, Wildlife Services refuses to accept and incorporate the findings of Johnson *et al.* (2016) and Sawyer *et al.* (2017), stating they do not "add substantively to the information and analyses" in the EA. AR000338–39. This is in error.

The Johnson *et al.* (2016) study, entitled *Increases in Residential and Energy Development are Associated with Reductions in Recruitment for a Large Ungulate*, found that "declining recruitment rates are correlated with expanding residential and energy development, particularly within deer winter ranges." AR018297.[5] The study's findings, which "have important implications for the conservation of mule deer in Colorado," AR018299, support prior research documenting land-use changes as a key factor contributing to mule deer decline, AR018300,

---

[5] AR018297–98 (continuing: "Land-use change causes direct habitat loss and fragmentation through the construction of infrastructure, and indirect habitat loss through deer avoidance of infrastructure and related activities. (Vogel, 1989; Sawyer *et al.* 2009; Northrup *et al.*, 2015); these consequences likely reduce the carrying capacity of the landscape. It has also been documented that deer migrating through areas with high densities of energy development detour from established routes, increase rates of movement, and reduce stopover use (Sawyer *et al.* 2013), impacts that may increase energetic costs while decreasing access to high-quality forage. Additionally, mule deer may suffer higher mortality rates in developed landscapes compared to natural areas (*but see* Hebblewhite & Merrill, 2011).").

and underscore the significance of increasing residential and energy development within mule deer habitat as a key factor inhibiting recruitment, especially in seasonal winter ranges. AR018289. Likewise, the Sawyer *et al.* (2017) study entitled, *Mule Deer and Energy Development — Long-term Trends of Habituation and Abundance*, concluded habitat loss and fragmentation from increasing oil and gas development in mule deer habitat is a key factor contributing to Colorado's mule deer population decline. AR018305–13.[6]

Yet, Wildlife Services brushes-off these critical scientific findings because they would not support their flawed assumptions that native predators — including, in particular, cougars and black bears — are to blame for allegedly decreased mule deer populations and newborn survival rates. AR000304 (stating simply: "[w]e disagree" with the analysis in Johnson, *et al.* (2016) because the study showed only a "correlative" and not necessarily a "causative" link between residential and energy development and mule deer demographics); AR000338–39 (refusing to consider the studies because they allegedly do not "add substantively" to the information and analysis of the EA).

---

[6] AR018311 ("[O]ur study suggests that measurable demographic consequences can be expected with large-scale energy development when native habitats are converted to infrastructure that animals avoid."); AR018312 ("Our long-term study refutes the prevailing notion that mule deer habituate to human disturbance, and instead, demonstrates that energy development can have long-term consequences for deer populations simply through avoidance behavior and the indirect habitat loss that ensues. Furthermore, as the NEPA process is based on full disclosure of the potential impacts from a proposed action, our work indicates that future impact assessments should disclose that the impacts to ungulate habitat in the shrub-steppe environment of the West may well be long-term and perhaps an irretrievable commitment of resources.").

Guardians submitted a wealth of information and data during public comment refuting Wildlife Services' theory that lethal control of native black bears and cougars is necessary to assess and remedy mule deer population declines. AR044090–95. Guardians also outlined the flawed basis underlying mule deer population estimates in Colorado, AR04490 (showing the population increasing from 2013-2015),[7] and provided Wildlife Services with imagery evidence documenting the overlay of oil and gas wells on mule deer habitat and alluding to the implications of increased habitat destruction from such development as negatively impacting mule deer in the State, AR044091–95. These images are striking, and show the massive habitat changes from oil and gas development in recent decades:

---

[7] AR044090 (stating: "Wildlife Services states that there were an estimated 600,000 mule deer in Colorado in 2006 and that this number dropped to 390,000 in 2013. However, this ignores that 600,000 mule deer is actually unsustainable and is far in excess of [Colorado Parks and Wildlife's ("CPW's")] goal of 501,000-557,000 mule deer for the State. Broscheid, 2016 at 7. [footnote omitted] Additionally, this number speaks only to the population's low point in 2013 despite the fact that populations have made a significant recovery since. In 2014 the population had grown to 424,000, in 2015 it was 436,000, and CPW predicted the population would be around 440,000 at the end of 2016. [footnote omitted] If this trend continues then the population will meet CPW's goals without Wildlife Services killing anything. CPW issued 83,200 mule deer hunting licenses in 2015 and recommended increasing that number to 88,915 in 2016 due to increasing numbers. [footnote omitted] These mule deer numbers show marked improvement and increased hunting quotas indicate CPW's confidence in increasing populations.").



AR044094 (map showing differences in oil and gas development in the Piceance Basin from 1984, when mule deer populations were very large, to 2016, when mule deer populations have declined).



AR044093 (map showing the Piceance Plan carnivore killing area and oil and gas wells

within and adjacent to that area).

Guardians also submitted other images of extensive oil and gas development in the

area, AR044092, AR044095, and a U.S. Bureau of Land Management map of the area

documenting its conclusion that much of the area is not meeting the standards for rangeland

health, AR044095.

Guardians' comments called out the inherent contradiction in the data and duties of Colorado Parks and Wildlife and Wildlife Services: the need to properly manage mule deer populations, but only having the authority over a minor aspect of the issue — potential predation by native carnivores. AR044091. Just because killing predators is one of the only actions these agencies are authorized to take does not mean such action equates to good science or that the action is justified.

Wildlife Services discounts this mounting evidence of habitat loss as a primary factor contributing to mule deer population declines in order to justify continuing its program of lethal predator damage management in Colorado. AR000054 (stating, without citation to any scientific authority, that "[p]redation is the primary proximate cause of mortality for all age classes [of mule deer in the West.]"). Wildlife Services cannot state that assessing the impacts of oil and gas development and residential land use changes is outside the scope of its analysis, AR000090–93, while altogether discounting these impacts to justify continued killing of native wildlife. AR000059; AR000111; AR000304. Wildlife Services' unsupported assumptions that ignore relevant evidence fail to adequately disclose, consider, and analyze the environmental impacts of its proposed action in violation of NEPA, and constitutes arbitrary and capricious agency action under the APA. 5 U.S.C. § 706(2)(A); 42 U.S.C. §§ 4332(2)(C)(i)–(v); 40 C.F.R. §§ 1502.14(a), 1502.16, 1508.7, 1508.8, 1508.14; *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

c.    **Wildlife Services relied on inaccurate data and misled the public on its scientific findings relating to black bears in Colorado**.

Wildlife Services' EA relies on inaccurate data and assumptions relating to the causes of increased levels of black bear and human/livestock conflict in Colorado in order to vindicate continuing its program of lethal control of black bears. Wildlife Services repeatedly asserts that black bears are responsible for leading causes of human conflict and damage to livestock producers, *see e.g.,* AR000034–000038; AR000041–42; AR000050, and that black bear predation and conflict has "increased sharply over the last decade." AR000036. However, Wildlife Services once again fails to look at the whole picture of the issue in reaching its narrowed conclusion that it must use lethal control. AR000160 (stating Wildlife Services' participation in lethal black bear control would be "beneficial" because killing bears "is the desired outcome").

Wildlife Services fails to adequately disclose, consider, and analyze the underlying causes of increased black bear depredation on livestock and human-bear conflicts: the intensifying effects of climate change and human encroachment on black bear habitat. *See* AR0246432–52 (Baruch-Mordo *et al.* (2008)); AR043783–86 (Young (2017)); AR016317–47 (Johnson, *Causes, Consequences, and Considerations for Management of Human-Black Bear Conflicts: Lessons Learned from Research in Durango* (2017)). While Wildlife Services acknowledges that the best available science supports a finding that black bears move into urban environments during years of poor natural food production — which in turn results in increased levels of human-bear conflict, AR000159 — the agency fails to relate this evidence to its so-called

need for a continuing regime of black bear killing. This violates the law.

Wildlife Services alleges that conflicts have increased because the black bear population has increased in Colorado. But recent findings indicate that the population has not increased, but rather conflicts are on the rise solely because bears are moving to different places in response to a changing climate and habitat needs. *See* S000224–34 (Laufenberg *et al.* (2018)); S000208–23 (Johnson *et al.* (2017)); S000200–06 (Romeo (2017)); *see also* AR0246432–52 (Baruch-Mordo *et al.* (2008)); AR043783–86 (Young (2017)); AR016317–47 (Johnson, *Causes, Consequences, and Considerations for Management of Human-Black Bear Conflicts: Lessons Learned from Research in Durango* (2017)). Wildlife Services also should have considered the impact of heightened mortality levels based on food shortages, which research demonstrate may become more prevalent in the future as a result of climate change. S000224–34 (Laufenberg *et al.* (2018)); *see also* AR043783–86 (Young (2017)); AR016317–47 (Johnson, *Causes, Consequences, and Considerations for Management of Human-Black Bear Conflicts: Lessons Learned from Research in Durango* (2017)). The failure to include this analysis — which represents a significant gap in the scientific research the agency relies upon in its EA — renders Wildlife Services' impacts analysis regarding the effects of its preferred alternative on Colorado's black bears inaccurate, misleading, and in violation of the law. 5 U.S.C. § 706(2)(A); 42 U.S.C. §§ 4332(2)(C)(i)–(v); 40 C.F.R. §§ 1502.14(a), 1502.16, 1508.7, 1508.8, 1508.14; *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

### d.   Wildlife Services relied on unsupported coyote population estimates.

Wildlife Services' coyote population estimate — and its resultant effects

determination — are arbitrary because they are based on a misstatement of the science, and thus "run[ ] counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43.

In fiscal years 2012 to 2016, Wildlife Services averaged killing 1,964 coyotes per year, for a total of roughly 9,820 coyotes killed. AR000144. Wildlife Services targets and kills more coyotes than any other native wildlife species in Colorado. AR000143–44, 000147. Wildlife Services concludes that this amount of killing is not significant though, because its killing activities have only "minor short-term impacts on coyotes locally, and no impact on the overall coyote population in Colorado." AR000148. In reaching this conclusion, however, Wildlife Services did not rely on accurate and evidence-based population estimates of the species.

Wildlife Services used an arbitrary estimate of coyote density per square mile, multiplied by the total area of Colorado, in order to estimate the total number of coyotes present in the state. AR000146–47 (estimating a total coyote population of 146,000 in Colorado). The agency relies on a combination of Gese e*t al.* (1989) and Hein and Andelt (1995) to derive its density estimates. *Id.* Gese *et al.* (1989) is used to support the agency's assertion that coyotes exist at a density of 0.75 per square mile on the 40.1% of Colorado lands with "less human influence" (i.e., federal and State Land Board lands). AR000146. On the other 59.9% of Colorado lands with "more human influence" (i.e., farms, urban, and suburban areas), the agency relies exclusively on Hein and Andelt (1995) to assert that coyotes exist at a density of 1.84 per square mile. AR000146.

However, Hein and Andelt (1995) is not a study about coyotes — it is a study assessing relative abundance indices of North American badgers. AR031643–47 (Hein and Andelt, *Evaluation of Indices of Abundance for an Unexploited Badger Population* (1995)). Hein and Andelt (1995) does not contain the coyote density estimate Wildlife Services claims, nor any coyote density estimate for that matter. *Id.* As a result, Wildlife Services' "conservative" coyote estimate of 1.4 per square mile is completely unsupported by the evidence in the record. AR000146–47.

While Hein and Andelt (1995) cites to a separate study assessing coyote density — Hein (1992), *see* AR031646–47 — that study is not in the administrative record, and therefore was not before the agency at the time its decision was made. Even giving the benefit of the doubt to the agency that it merely cited the incorrect study, this significant oversight shows that the agency has not given due thought and consideration to the facts underlying its assumptions and upon which it is basing its decision — a decision that entails killing thousands of native wildlife each year. Such an evidentiary oversight and misrepresentation of the data represents a clear violation of NEPA and the APA. 5 U.S.C. § 706(2)(A); 42 U.S.C. §§ 4332(2)(C)(i)–(v); 40 C.F.R. §§ 1502.14(a), 1502.16, 1508.7, 1508.8, 1508.14; *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

## II.   Wildlife Services failed to provide a convincing statement of reasons to justify its decision to forego preparation of an Environmental Impact Statement.

NEPA requires Wildlife Services to prepare an Environmental Impact Statement ("EIS") when it proposes a major federal action that may significantly affect the quality of

the environment. 42 U.S.C. § 4332(2)(C); *Middle Rio Grande Conservancy Dist. v. Norton*, 294

F.3d 1220, 1224 (10th Cir. 2002); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208,

1212 (9th Cir. 1998) ("[A] 'plaintiff need not show that significant effects will in fact occur

….' It is enough for the plaintiff to raise 'substantial questions whether a project may have a

significant effect' on the environment." (internal citation omitted)). If a party raises

substantial questions regarding whether a project may have a significant effect on the

environment, "a decision not to prepare an EIS is unreasonable." *Blue Mountains Biodiversity

Project*, 161 F.3d at 1211 (internal citation omitted); *see also Middle Rio Grande Conservancy Dist.*,

294 F. 3d at 1224 ("If the EA results in a finding of possible significant impacts, NEPA

requires preparation of an EIS."). If an agency chooses to prepare an EA instead of an EIS,

it must include a "convincing statement of reasons" that explains why the project will not

have significant impacts. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864 (9th

Cir. 2005) (citation omitted).

 In making the determination as to whether or not to prepare an EIS, Wildlife Services

"must consider both the context and the intensity of the proposed action." *Dine CARE*, 747

F. Supp. 2d at 1249 (citing 40 C.F.R. § 1508.27). "Context refers to the scope of the

proposed action, including the interests affected." *Id.* (citing 40 C.F.R. § 1508.27(a)).

Assessing context requires that an action be "analyzed in several contexts such as society as a

whole (human, national), the affected region, the affected interests, and the locality[,]" with

both short- and long-term effects being relevant. 40 C.F.R. § 1508.27(a). Intensity "refers to

the severity of impact," and requires consideration of a number of factors, including:

beneficial and adverse impacts; unique characteristics of the geographic area such as proximity to ecologically critical areas; the degree to which effects are likely to be controversial, highly uncertain, or involve unique or unknown risks; the precedential nature of the action; whether the action is related to other actions with cumulatively significant impacts; and the degree of adverse effects on species listed as endangered or threatened under the Endangered Species Act. 40 C.F.R. § 1508.27(b).

Importantly, the presence of any single significance factor can be sufficient to require the preparation of an EIS, *Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008) ("an action may be 'significant' if one of these factors is met"), and consideration of several significance factors cumulatively can also require preparation of an EIS. *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1262, 1263 (10th Cir. 2019); *Anderson v. Evans*, 371 F.3d 475, 494 (9th Cir. 2004) (requiring EIS based on consideration of multiple NEPA significance factors); *Cascadia Wildlands v. Forest Service*, 937 F. Supp. 2d 1271, 1283–84 (D. Or. 2013) ("[W]hen considered individually, none of these significance factors might require an EIS. However, when considered collectively, they do.").

Here, Wildlife Services' assertion that its predator damage management program in Colorado will not have significant impacts fails to demonstrate that an EIS is not required. To the contrary, Wildlife Services' proposed predator damage management activities in Colorado have far-reaching and extremely significant impacts on Colorado's environment. These factors — both individually and in combination — indicate that an EIS is required. Like in *San Juan Ecosystem Council v. U.S. Forest Service,* the agency "deprecated — and in some

instances ignored — numerous repetitive, corroborated actual or potential impacts on the human environment resulting from" its chosen action. No. 04-cv-01071-MSK, 2007 WL 1463855 at *9 (D. Colo. May 17, 2007); *see also Sierra Club v. U.S. Fish and Wildlife Serv.*, 235 F. Supp. 2d 1109 (D. Or. 2002) (requiring preparation of an EIS to assess the impacts of a predator killing study funded primarily by the federal government). Wildlife Services' decision to authorize and implement the proposed action without first preparing an EIS is arbitrary and capricious, and not in compliance with NEPA. 5 U.S.C.§ 706(2)(A).

> a.   **Wildlife Services' proposed actions contemplate significant impacts such that an EIS is required.**

Wildlife Services' predator damage management activities in Colorado demonstrably *may* have significant impacts. Significant impacts "may be both beneficial and adverse" and a "significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. § 1508.27(b)(1). Actions may have significant cumulative impacts that require the preparation of an EIS. Significant cumulative impacts exist "if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 C.F.R. § 1508.27(b)(7).

Here, as discussed *supra*, implementation of Wildlife Services' EA and DN/FONSI may have significant effects. The selected alternative contemplates the "use of all appropriate [predator damage management] methods, used singly or in combination, to resolve damage caused by" coyote, red fox, black bear, mountain lion, American badger, bobcat, swift fox,

gray fox, American marten, American mink, gray wolf, and a variety of other species. AR000010. This work would occur throughout Colorado. AR000047. In the past, this work has resulted in Wildlife Services killing thousands of native carnivores annually in Colorado. AR000143.

The EA specifically contemplates that Wildlife Services may kill up to 53% of mountain lion populations in certain areas. AR00163. Wildlife Services describes this as a "moderate impact," yet simultaneously notes that the long-term sustainable harvest rate for mountain lions is 11%. *Id.* Killing 53% of the mountain lion population, even if at a localized level, when the sustainable harvest rate is 11%, is significant, and is indicative of the deficiencies in Wildlife Services' explanation for why an EIS is not required. *See Sierra Club*, 235 F. Supp. 2d at 1131–32 (holding plaintiffs "raised 'substantial questions whether [the elk study] may have a significant effect' on the environment" and thus requiring an EIS where the agency failed to consider the cumulative mortality rates of cougars from all sources combined).

The direct, indirect, and cumulative effects of Wildlife Services' proposed action are significant individually and significant cumulatively, and indicate that there may be significant effects to the environment such that an EIS is required. 40 C.F.R. § 1508.27(b)(1); 40 C.F.R. § 1508.27(b)(7).

  **b.**  **Wildlife Services' proposed actions may affect public health and safety in Colorado.**

  Wildlife Services' Colorado predator damage management program may have significant effects to public safety. *See* 40 C.F.R. § 1508.27(b)(2). As part of its proposed actions, Wildlife Services intends to deploy poisonous gas discharge systems in Colorado. AR000299. This includes the use of M-44 sodium cyanide devices. AR000463. There is no question that exposure to sodium cyanide presents a risk to public health and safety, nor is there a question that Wildlife Services is responsible for this risk.

  Indeed, since 1987, there have been at least sixteen reported instances of human exposure to sodium cyanide as a result of contact with M-44s. *See* AR043800 (describing dog triggering an M-44 placed on private property that resulted in a human suffering secondary poisoning after giving dog mouth-to-mouth resuscitation); *compare* Am. Petition, ECF No. 26 at 12 ¶ 36, *and* Answer, ECF No. 27 at 11 ¶ 36 (admitting allegation). Many of these events also resulted in the death of domestic dogs. *See* AR043801 (describing a father and daughter in Crawford, Colorado watching their dog die after triggering an M-44 that had been placed on their property by Wildlife Services without their permission); *compare* Am. Petition, ECF No. 26 at 11-12 ¶ 34, *and* Answer, ECF No. 27 at 10 ¶ 34 (admitting allegations regarding the Crawford, Colorado incident); *see also* AR043800–02 (describing 12 similar events).[8]

---

[8] Wildlife Services use of lethal M-44s has proven dangerous elsewhere across the nation. For example, in a single month in 2017, a non-target gray wolf was killed by one of Wildlife Services' M-44s in Oregon and a family's two dogs were killed by Wildlife Services' M-44s while on a hike in Wyoming. *Compare* Am. Petition, ECF No. 26 at 13 ¶ 37, *and* Answer, ECF No. 27 at 11 ¶ 367 (admitting allegations). Further,

Wildlife Services asserts its predator damage management "methods are target specific and are not likely to adversely affect human health and safety." AR000472. But M-44s and other poisons and traps are indiscriminate, and thus, by their nature, are not "target specific." That Wildlife Services has exposed numerous people to sodium cyanide, with many of them requiring hospitalization, and many also witnessing the death of their innocent companion animals, is evidence that its actions *may* cause significant impacts to public health and safety in the future.

The potential effects to public health and safety from Wildlife Services' proposed action are significant individually and significant cumulatively, and indicate that there may be significant effects to the environment such that an EIS is required. 40 C.F.R. § 1508.27(b)(2).

      **c.**    **Wildlife Services' proposed actions would be implemented in areas with unique characteristics, including ecologically critical areas.**

Implementation of the EA and DN/FONSI would lead to lethal control activities in or near areas with "unique characteristics," including in ecologically critical areas. 40 C.F.R. §1508.27(b)(3). Because the EA and DN/FONSI would allow Wildlife Services to conduct predator damage management activities throughout Colorado, it is possible that such activities would occur in or near ecologically critical areas such as designated Wilderness areas, Wilderness Study Areas and recommended Wilderness areas, roadless areas, National Parks, and National Monuments. Documents show that Wildlife Services employees have

---

that same month, a 14-year old boy found one of Wildlife Services' M-44s near his home in Pocatello, Idaho, resulting in the death of his dog, as well as his and a sheriff's deputy's hospitalization from cyanide exposure. AR043802.

spent at least 124 hours operating in designated Wilderness areas (during fiscal years 2012–2016), including lethally removing predators. AR000537; AR000539. The District of Idaho recently concluded that the possibility of future predator damage management activities in Wilderness Study Areas and other special places "is yet another reason for requiring an EIS." *Western Watersheds Proj.*, 320 F. Supp. 3d at 1150.

The DN/FONSI asserts that none of the activities contemplated in the EA "affect the physical environment" and "will not have an impact on unique characteristics of the geographic area." AR000472. However, Wilderness areas are unique, for example, because these lands are "area[s] where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." 16 U.S.C. § 1131(c). These lands are to be "protected and managed so as to preserve [their] natural condition" and that is "affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable." *Id.* Moreover, the presence of predators in or near these areas gives these areas the "unique characteristics" that make them so special. Lethally removing predators from Wilderness adversely impacts the wilderness characteristics of these areas.

Given Congress' clear and unambiguous statements about the purpose and state of Wilderness lands, impacts to those natural features are significant, especially when it involves the lethal removal of native predators such as coyotes, black bears, and mountain lions. The potential for implementation of the EA and DN/FONSI in or near areas with "unique characteristics" indicates that there may be significant effects to the environment such that an EIS is required. 40 C.F.R. § 1508.27(b)(1); 40 C.F.R. § 1508.27(b)(3).

> d.   **Wildlife Services' proposed actions would have highly controversial and highly uncertain effects, and involve unique and unknown risks.**

NEPA requires that an EIS be prepared when the effects of federal action are "highly controversial," 40 C.F.R. § 1508.27(b)(4), or "highly uncertain or involve unique or unknown risks," 40 C.F.R. § 1508.27(b)(5). Here, the EA and DN/FONSI present highly controversial and highly uncertain effects that involve unique or unknown risks.

A federal project is "highly controversial" if there is "a substantial dispute as to the size, nature, or effect of the action." *Middle Rio Grande Conservancy Dist.*, 294 F.3d at 1229. "An EIS is warranted 'where uncertainty may be resolved by further collection of data,' especially where such data may reduce the need for speculation." *Town of Superior v. U.S. Fish and Wildlife Serv.*, 913 F. Supp. 2d 1087, 1120 (D. Colo. 2012) (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005)).

As discussed *supra* in Argument Section I(a), the record contains extensive amounts of recent, peer-reviewed scientific research articles calling into question the efficacy of Wildlife Services' lethal control methods and the effects of killing native predators. And while Wildlife Services may think that those studies do "not add substantively to the information and analyses" in the EA, AR000338–40, they remain indicative of the type of scientific controversy that NEPA requires be explored and analyzed in an EIS.

At least two other district courts have faulted Wildlife Services for its treatment of opposing scientific literature representing a dispute amongst experts.

Recently, the District of Idaho concluded that a Wildlife Services predator damage

management program in Idaho required an EIS in part because "Wildlife Services has serious disagreements with leading experts, and has not given their studies the full attention they deserve." *Western Watersheds Proj.*, 320 F. Supp. 3d at 1149. In that case, the District of Idaho looked specifically at some of the same papers discussed *supra* and the same rebuttals from Wildlife Services, concluding that they constituted significant controversy requiring an EIS. *Id.* at 1143–44, 1148–49 (discussing Treves *et al.* (2016), amongst other papers, and the resulting scientific controversy).

Similarly, the Western District of Washington also concluded that a Wildlife Services predator killing program required an EIS because of "the significant disagreement among experts regarding the effectiveness of removal to address depredation, a question summarily dismissed [by] Wildlife Services." *Cascadia Wildlands v. Woodruff*, 151 F. Supp. 3d 1153, 1165 (W.D. Wash. 2015). Here, Wildlife Services attempts to brush aside science that challenges its assumptions and business-as-usual approach to wildlife management, but as multiple other district courts have concluded, these efforts only serve to underscore the controversy, and the need for a thorough EIS exploring this controversy in depth. *Western Watersheds Proj.*, 320 F. Supp. 3d at 1147–50; *Cascadia Wildlands*, 151 F. Supp. 3d at 1165.

Additionally, Wildlife Services' predator damage management activities in Colorado contemplate highly uncertain effects. For example, placing sodium cyanide devices on the landscape that any person or animal could trigger necessarily leads to just such "uncertain effects." When one places a trap or poison device on the landscape, it is unknown what the result of that lethal device will be. Additionally, part of Wildlife Services' proposed predator

damage management activities relate to participating in Colorado Parks and Wildlife's predator killing studies whose outcomes are highly uncertain. Indeed, Wildlife Services itself refers to one such study as an experiment. *Compare* Am. Petition, ECF No. 26 at 17 ¶ 47, *and* Answer, ECF No. 27 at 15 ¶ 47 (admitting allegation). And Colorado Parks and Wildlife notes that the anticipated effects of the studies is highly uncertain. *See* AR000439 ("The impact of cougar hunting on cougar populations, especially high levels designed to suppress populations, can be varied and is not well understood.").

The experimental nature of some of Wildlife Services' proposed predator damage management activities in Colorado represents the very definition of highly uncertain effects under NEPA. Of course, the purpose of a study or experiment is to learn what happens, meaning one does not know the end result. The District of Oregon recently tackled the issue of highly uncertain effects in a case related to a small, 187-acre, experimental logging project. *Or. Wild v. U.S. Bureau of Land Mgmt.*, No. 6:14-cv-0110-AA, 2015 WL 1190131, at *2, *8–9 (D. Or. Mar. 14, 2015). There, the U.S. Bureau of Land Management was experimenting with logging prescriptions to better understand their effects on the northern spotted owl. *Id.* at *8. There, as here, the agency admitted that while it thought it knew what the results may be, the study was needed to see how it played out in real life. *Id.* There, as here, the "conclusion in the FONSI that 'there is little uncertainty regarding [the] effects' of the pilot project runs counter to the evidence in the record." *Id.* at *9. Ultimately, the District of Oregon concluded that the outcome of an approximately 187-acre experimental logging project was highly uncertain, and therefore required an EIS under NEPA. *Id.* Just as in *Or.*

*Wild*, here, Wildlife Services also contemplates taking experimental action whose outcome is highly uncertain, and therefore counsels that an EIS should have been prepared.

The significant controversy about the efficacy and outcomes of the proposed predator damage management activities and highly uncertain aspects of those same activities should be explored in depth in an EIS. *See Sierra Club*, 235 F. Supp. 2d at 1134–35 (requiring preparation of an EIS due to a predator killing study's controversial and uncertain impacts). The EA and DN/FONSI contemplate highly controversial and highly uncertain effects and therefore an EIS is required. 40 C.F.R. § 1508.27(b)(1); 40 C.F.R. § 1508.27(b)(4); 40 C.F.R. § 1508.27(b)(5); *Or. Wild*, 2015 WL 1190131, at *8-9; *Western Watersheds Proj.*, 320 F. Supp. 3d at 1149.

### e. Wildlife Services' proposed actions may have an adverse effect on threatened or endangered species.

Wildlife Services must assess the significance of the "degree to which the action may adversely affect an endangered or threatened species." 40 C.F.R. § 1508.27(b)(9). Here, Wildlife Services' predator damage management activities in Colorado may have significant effects on species listed as threatened or endangered under the Endangered Species Act ("ESA"). Wildlife Services and the U.S. Fish and Wildlife Service concluded that the proposed activities may affect several such threatened or endangered species, including the least tern, piping plover, southwestern willow flycatcher, California condor, Gunnison sage-grouse, gray wolf, and Canada lynx. AR015706, AR016020.

In the past, Wildlife Services has accidentally taken a Canada lynx when targeting other species. AR015926. Importantly, even the take of a single Canada lynx matters. For this reason, Wildlife Services' incidental take statement from the U.S. Fish and Wildlife Service only allows a single take of a lynx before Wildlife Services must reinitiate consultation under Section 7 of the ESA. AR015938. And importantly, Wildlife Services itself notes that the ESA-listed "species that have the greatest chance of being affected by [predator damage management] programs are larger mammals such as Canada lynx …." AR000370.

The presence of any effects to a species listed as threatened under the ESA, such as lynx, demonstrates the significant impacts that the project may have on the environment. When considered with the other significance factors, an EIS is clearly required, and Wildlife Services' EA and DN/FONSI are arbitrary and capricious. 40 C.F.R. § 1508.27(b)(9).

## CONCLUSION

For the foregoing reasons, the Court should grant Guardians' First Amended Petition for Review, issue declaratory relief outlining Wildlife Services' violations of law, and vacate the EA and DN/FONSI as required by the APA. 5 U.S.C. § 706(a)(2).

Respectfully submitted and dated this 28th day of June, 2019.

/s/ Kelly E. Nokes
Kelly E. Nokes (Colo. Bar No. 51877)
Western Environmental Law Center
208 Paseo del Pueblo Sur, No. 602
Taos, NM 87571

Ph: (575) 613-8051
nokes@westernlaw.org

/s/ John R. Mellgren
John R. Mellgren (OSB #114620)
Western Environmental Law Center
120 Shelton McMurphey Blvd., Ste. 340
Eugene, Oregon 97401
Ph. (541) 359-0990
mellgren@westernlaw.org

*Attorneys for Petitioners:*

WildEarth Guardians
2590 Walnut Street
Denver, CO 80205

Center for Biological Diversity
P.O. Box 710
Tucson, AZ 85702-0710

## CERTIFICATE OF COMPLIANCE

I, the undersigned counsel of record, hereby certify that this brief contains less than

11,000 words. ECF No. 25 at 6.

/s/ Kelly E. Nokes
Kelly E. Nokes