**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 17-cv-00891-RM

WILDEARTH GUARDIANS, a non-profit organization, and
CENTER FOR BIOLOGICAL DIVERSITY, a non-profit organization,

    Petitioners,

v.

KEITH WEHNER, in his official capacity as the Director of the U.S. Department of
Agriculture's Animal and Plant Health Inspection – Wildlife Services' Western Region,
ANIMAL AND PLANT HEALTH INSPECTION SERVICE-WILDLIFE SERVICES, a federal
program, and
UNITED STATES DEPARTMENT OF AGRICULTURE, a federal department,

    Respondents.

---

## ORDER

---

Petitioners WildEarth Guardians and the Center for Biological Diversity (collectively,

"WildEarth") bring this action under the Administrative Procedure Act ("APA") seeking a

declaration that Keith Wehner[1], in his official capacity as the Director of the U.S. Department of

Agriculture's Animal and Plant Health Inspection – Wildlife Services' Western Region, Animal

and Plant Health Inspection Service, Wildlife Services (collectively, "Wildlife Services"), and

the U. S. Department of Agriculture have violated the National Environmental Policy Act

("NEPA").  This matter is fully briefed; the Court finds that oral argument would not materially

assist in the disposition of this matter.  Thus, it is ripe for decision.  Upon consideration of the

petition and the administrative record ("AR"), applicable law, and being otherwise fully advised,

---

[1] Keith Wehner is the acting Director of Wildlife Services' Western Region and, therefore, was automatically
substituted as the defendant in this case.  *See* Fed. R. Civ. P. 25(d).

the Court finds and orders as follows.

## I.     LEGAL STANDARDS

### A.     NEPA

NEPA represents a "'broad national commitment to protecting and promoting environmental quality.'"  *Cure Land, LLC v. U.S.D.A.*, 833 F.3d 1223, 1229 (10th Cir. 2016) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989)).  Thus, NEPA "'imposes procedural requirements [on agencies] intended to improve environmental impact information available to agencies and the public.'"  *Cure Land, LLC*, 833 F.3d at 1229 (underscore in original) (quoting *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009)).  NEPA does not, however, "'require agencies to reach particular substantive environmental results.'"  *Cure Land, LLC*, 833 F.3d at 1229 (quoting *Los Alamos Study Grp. v. U.S. Dep't of Energy*, 692 F.3d 1057, 1060 (10th Cir. 2012)).

To comply with NEPA, agencies are required to take "a hard look at the environmental consequences before taking a major action."  *Cure Land, LLC*, 833 F.3d at 1229 (quotation marks and citation omitted).  Thus, first, NEPA "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action."  *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 690 (10th Cir. 2015) (quotation marks and citation omitted).  Then, second, NEPA "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process."  *WildEarth Guardians*, 784 F.3d at 690 (quotation marks and citation omitted).

Under NEPA, where it is unclear whether a proposed action's environmental effects will significantly affect the quality of the human environment, an agency may prepare an environmental assessment ("EA").  *Cure Land, LLC*, 833 F.3d at 1230; 40 C.F.R. § 1501.4(b).

"If the EA leads the agency to conclude that the proposed action will not significantly affect the environment, the agency may issue a finding of no significant impact [FONSI] and proceed with the federal action without further ado." *Cure Land, LLC*, 833 F.3d at 1230 (quotation marks and citation omitted); 40 C.F.R. § 1501.5(c) & (e). A FONSI is "a document by a Federal agency briefly presenting the reasons why an action . . . will not have a significant effect on the human environment and for which an environmental impact statement [EIS] therefore will not be prepared." 40 C.F.R. § 1508.1(l).

### B.   Agency Review

The Court reviews an agency's compliance with NEPA under the APA, 5 U.S.C. §§ 551 *et seq*. *Cure Land, LLC*, 833 F.3d at 1230. The review is "'highly deferential' to the agency." *Id.* (quoting *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008)). An agency decision will not be set aside unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Cure Land, LLC*, 833 F.3d at 1230. An agency's action is arbitrary and capricious if it has relied on factors which Congress has not intended it to consider, failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before it. *Wyoming v. U.S. Dept. of Agriculture*, 661 F.3d 1209, 1227 (10th Cir. 2011). Agency action also is arbitrary and capricious if it "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quotation marks and citation omitted). A presumption of validity is afforded to agency action and the burden is on the plaintiff who challenges such action. *Id.*

## II.   BACKGROUND

Wildlife Services is a federal program within the U.S. Department of Agriculture's

Animal and Plant Health Inspection Service that specializes in resolving wildlife conflicts.[2]  (AR at 9.)  Wildlife Services' Colorado branch ("WS-Colorado") provides predator damage management ("PDM") to help reduce conflicts with predators that impact livestock, agricultural and natural resources, property, and human and health safety.  (AR at 34.)  WS-Colorado has been conducting PDM in Colorado for more than a century.  (AR at 30.)  WS-Colorado does not act unilaterally; rather, it responds to requests from private and public entities, tribes, and other federal, state, and local governmental agencies for assistance with wildlife management.  (AR at 17.)

In April 2018, Wildlife Services, in cooperation with the Colorado Department of Agriculture, Colorado Parks and Wildlife, the Bureau of Land Management, and the U.S. Forest Service, issued an EA for WS-Colorado's ongoing PDM program to consider the environmental consequences of four proposed courses of action.  Historically, WS-Colorado has prepared four EAs for its PDM program which served as the baseline for the 2018 EA at issue here.[3]  (AR at 26.)  The purpose of WS-Colorado's activities examined in the EA is to reduce environmental harms caused by predators that prey on or harass livestock and wildlife, damage other agricultural resources and property, impact wildlife species, or threaten human health and safety in Colorado.  The predator species of management concern most often include coyotes, black bears, mountain lions, striped skunks, red fox, and racoons.  (AR at 11.)

The EA examined four plans of action, or alternatives, in deciding to how best address PDM requests.  These are to: (1) continue the current federal integrated PDM program (no action); (2) utilize lethal PDM methods only for corrective control; (3) provide technical

---

[2] Unless otherwise indicated, the page references in this Order are to the page numbers as set forth in the AR found at the bottom right-hand corner of the document.
[3] WildEarth's original petition for review of agency action filed in 2017 challenged WS-Colorado's 2016 EA.  (ECF No. 1.)  The petition was subsequently amended in August 2018 and now attacks the 2018 EA.

assistance only; and (4) provide no PDM.  (AR at 100.)  Based on the economic, environmental, and societal impact of each approach, WS-Colorado determined that Alternative 1 was the preferred alternative to accomplish its PDM goals and objectives.  Under Alternative 1, WS-Colorado would continue to provide technical and operational assistance in response to predator management requests using a variety of lethal and non-lethal methods.[4]  (AR at 104.)  The EA concluded that continuing WS-Colorado's predator management program would not have significant environmental impacts.  (AR at 260.)  Thus, WS-Colorado issued a FONSI and did not prepare an EIS.

## III.   DISCUSSION

WildEarth asks the Court to vacate the EA and FONSI alleging that WS-Colorado did not take a "hard look" at the environmental impacts of the PDM program.  (ECF No. 47 at 8.)  WildEarth also asks the Court to compel WS-Colorado to prepare an EIS because the proposed program significantly impacts the environment.[5]  (*Id.*)  WS-Colorado contests these requests, arguing that it complied with NEPA and applicable regulations in finding no significant environmental impact from its predator management program and, therefore, did not need to order an EIS.  (ECF No. 48 at 15.)

### A.   The Environmental Assessment

WildEarth raises three issues with the adequacy of the EA, that it: (1) fails to sufficiently analyze the efficacy of lethal PDM techniques; (2) fails to consider the impact of oil and gas and

---

[4] "Non-lethal methods consist primarily of actions, tools, or devices used to disperse or capture a particular animal or a local population, modify habitat or animal behavior, create exclusion between predators and damage potential, and/or practicing husbandry to reduce the risk of or alleviate damage and conflicts."  (AR at 343.)  Methods such as traps, snares, pursuit dogs, and cable devices are considered non-lethal but can be used lethally in some circumstances.  (AR at 348.)  Lethal methods include shooting, and chemical fumigants and pesticides.  (AR at 463.)
[5] WildEarth challenges the EA and FONSI with regard to the proposed PDM program as a whole and as it applies to two specific state projects conducted by a local agency, Colorado Parks and Wildlife.  The Court will address WS-Colorado's EA and FONSI under the NEPA framework as a whole as this includes the two state projects.

residential development in mule deer habitats; and (3) relies on inaccurate data in finding no

significant impact on black bear and coyote populations.  These arguments are subspecies of the

ultimate issue of whether WS-Colorado took the requisite "hard look" under NEPA at the

environmental impacts of its proposed action in the EA.

As noted previously, NEPA imposes procedural requirements on agency action.

"Importantly, the statute does not impose substantive limits on agency conduct.  Rather, once

environmental concerns are 'adequately identified and evaluated' by the agency, NEPA places

no further constraint on agency actions." *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1213

(10th Cir. 1997) (citation omitted).

## 1.     Efficacy of Lethal PDM

WildEarth urges WS-Colorado to cease using lethal means to address predator damage in

Colorado.  As WildEarth alleges, this is because lethal techniques employed by WS-Colorado

are not a reliable and effective means of depredation.  In support of its position, WildEarth

references three scientific articles contained in the record which call into question the efficacy of

these lethal PDM techniques.  (ECF No. 47 at 18-21.)  Concerned citizens echoed this belief

during the EA public comment period, submitting numerous comments on the ethics and

humaneness of lethal PDM.  (AR at 310-12.)  In response, WS-Colorado argues that it

considered many scientific articles both favoring and opposing lethal control techniques in

reaching its decision.  (ECF No. 48 at 23-27.)  WS-Colorado further notes that it addressed the

public comments at length, distinguishing various articles put forth which disparage lethal PDM

activities in the EA.  (*Id.* at 23.)

The EA is rife with analysis and discussion of scientific articles concerning lethal and

non-lethal means of PDM.  (*See, e.g.*, AR at 39, 52-53, 56, 69-70, 310-12.)  In fact, all three

articles WildEarth contends were not adequately considered are discussed in the EA.  For example, Dr. Treves' article which criticized research methods used for evaluating the effectiveness of lethal PDM to protect livestock is examined at length.  (AR at 69-71.)  WS-Colorado conducted a detailed analysis of the article and determined that Dr. Treves "has misinterpreted and improperly assessed the quality and conclusions of many peer-reviewed articles included" in his paper.  (AR at 70.)  As a consequence, WS-Colorado doubted the conclusions and recommendations set forth in Dr. Treves' paper, outlining at least six channels of error.  This is precisely the type of discussion NEPA requires.

The EA also recognized that the "lethal PDM methods discussed in the EA have been shown to be effective in resolving conflicts with mammalian predators."  (AR at 310.)  Specifically, WS-Colorado's determination of the effectiveness of Alternative 1 is based on field studies across multiple states, interviews with property owners and state wildlife officials, logbook samples cross-referenced with management information system data, and reviews of cooperative service agreements and NEPA documentation on predator control.  (AR at 76.)

An additional aspect of the overall effectiveness of Alternative 1 discussed in the EA is cost efficacy.  Based on scientific research and a multi-factor evaluation, the EA determined that lethal PDM activities included in Alternative 1 have a benefit to cost ratio somewhere between 2:1 to 27:1, meaning that at least every ten dollars spent on lethal PDM activities protects twenty dollars' worth of livestock.  (AR at 75-78.)  The EA explained that while this financial analysis is not required under the federal regulations, it was illustrative of the overall effectiveness of the proposed lethal PDM techniques.  (AR at 72.)  Finally, in its efficacy evaluation, field studies in the EA indicated that the cumulative take of target predators would not have a significant impact on the environment because WS-Colorado kills only a small percentage of those predator

populations.  (AR at 143-144.)

While lethal PDM activities may not be the most socially acceptable method of quelling predation, scientific literature included in the EA indicates they are effective and sometimes necessary.  There is a healthy breadth of discussion in the EA concerning the efficacy of lethal PDM.  This record shows that WS-Colorado followed the procedure prescribed under NEPA.  The outcome or result which ensues from taking these steps is ancillary to the procedural process.  There is reliable scientific research on which both parties rely, amounting to a "disagreement among experts or in the methodologies employed" and that "is generally not sufficient to invalidate an EA."  *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 782 (10th Cir. 2006).  In the presence of fairly conflicting scientific literature, WS-Colorado made a systematic determination in deciding which view to endorse.  WS-Colorado, as the agency tasked to make this tough choice, must have discretion in deciding which technique to employ.  Thus, the EA shows that WS-Colorado took the requisite "hard look" at the impact of lethal PDM activities on the environment.  *See Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 704 (10th Cir. 2010) (explaining that a court cannot "displace the [agency's] choice between two fairly conflicting views").

2.     Impact of Oil and Gas and Residential Development

Next, WildEarth argues that WS-Colorado failed to consider oil and gas development and human population growth as contributing factors to decreased mule deer populations in Colorado.  (ECF No. 47 at 22.)  WS-Colorado disagrees, arguing that it considered these factors as they relate to habitat loss.  (ECF No. 48 at 28.)

The EA must "[b]riefly discuss the . . . environmental impacts of the proposed action." 40 C.F.R. § 1501.5(c)(2).  An effect or impact from planned action includes "changes to the

human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives." 40 C.F.R. § 1508.1(g).  This does "not include those effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action." 40 C.F.R. § 1508.1(g)(2).

The EA explicitly considered the impacts of oil and gas development on animal habitats. (AR at 90-93.)  After such consideration, WS-Colorado concluded oil and gas development "adversely affect[s] certain wildlife species," and that deer populations are decreasing as a result of habitat loss, but that the cumulative impact of PDM techniques employed by WS-Colorado would not contribute to that loss, "and are not expected to contribute to adverse effects on most of the wildlife species" affected by oil and gas development.  (AR at 92.)  WS-Colorado also stated that it has no authority to affect decisions of other entities, such as the Bureau of Land Management, which control oil and gas development on public land, and that oil and gas development would occur regardless of the chosen PDM protocol.  (AR at 91.)

The EA additionally considered human population growth as a factor contributing to decreased animal populations, explaining that Colorado is one of the fastest growing states in the nation, and that the "growth in the human population and many wildlife species ha[s] led to increased conflicts" which only heightened the need for intervention.  (AR at 46.)

These discussions demonstrate that WS-Colorado considered and accounted for the impact of oil and gas development and human population growth as contributing factors to wildlife conflicts in the EA.  WS-Colorado analyzed various studies which discussed the effect of oil and gas development on certain species' habitats, including deer and elk.  Thus, WS-Colorado had a rational basis and considered relevant factors in reaching its determination.

*Silverton Snowmobile Club*, 433 F.3d at 782 (finding that the agency "satisfied NEPA's 'hard look' requirement" where it considered "that human activity in the area was expected to increase dramatically in the next decade" in determining the proper restrictions on recreation activities adjacent to a protected species' habitat).

       3.    <u>Black Bear and Coyote Data</u>

For its last attack on the EA, WildEarth argues that WS-Colorado relied on inaccurate data relating to target predator species. Specifically, WildEarth claims WS-Colorado neglected to analyze human population growth and climate change as factors contributing to increased levels of black bear and human conflicts in Colorado. (ECF No. 47 at 29-30.) WildEarth also claims that WS-Colorado erroneously estimated coyote populations. (ECF No. 47 at 30-32.)

With regard to black bear data, the EA surveyed human population growth, climate change, and the increase in bear population as factors contributing to added conflicts between people and bears. (AR at 46, 97, 159.) WildEarth fails to provide information refuting this point. Thus, WS-Colorado's review of factors contributing to increased black bear and human conflicts is sufficient under NEPA.

Examining coyote population estimates used in the EA yields a similar result. WS-Colorado relied on a scientific study which estimated the coyote density at 1.84 coyotes per square mile in calculating the coyote population in Colorado. (AR at 146.) WildEarth claims that because the EA mistakenly cited to a badger population study, conducted by the same scientists as the coyote study, instead of the coyote population study that the EA did not comply with the requirements of NEPA. The Court disagrees. Even though the article was miscited, WS-Colorado relied on the correct data in estimating the coyote population. This single oversight in an EA with hundreds of sources amounts to mere flyspeck and does not undercut the

validity of the population estimate.  *See Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Engineers*, 702 F.3d 1156, 1165 (10th Cir. 2012) ("Deficiencies in an [environmental assessment] that are mere 'flyspecks' and do not defeat NEPA's goals of informed decisionmaking and informed public comment will not lead to reversal.") (alternation in original) (citation omitted).

In all, the record shows that WS-Colorado rationally evaluated the effects of its proposed PDM activities on the environment and had a sufficient basis for its findings.  Assessing the potential impact of those activities involves technical and scientific matters of agency expertise, and the Court will not displace WS-Colorado's choice between two fairly conflicting views.  Accordingly, WS-Colorado satisfied NEPA's "hard look" requirement.

**B.      Finding of No Significant Impact**

As WS-Colorado did here, an agency may conduct an EA in determining whether performing an EIS is necessary.  Having determined in the EA that its PDM activities would not have a significant impact on the environment, WS-Colorado issued a FONSI.  WildEarth disagrees with this course of action, arguing that, based on the EA, WS-Colorado was required to perform an EIS.  (ECF No. 47 at 32.)  WS-Colorado maintains that its EA was accurate and that issuing a FONSI and forgoing preparation of an EIS was not arbitrary and capricious.  (ECF No. 48 at 31.)

In reviewing an agency's decision to issue a FONSI instead of an EIS, the Court asks whether the agency's method of analyzing environmental effects "had a rational basis and took into consideration the relevant factors."  *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1257, 1262 (10th Cir. 2019) (quotation marks and citation omitted).  This review is limited to whether the agency weighed the relevant factors, not "whether it could have discussed environmental

impacts in more detail." *Conner*, 920 F.3d at 1257 (explaining that "we review whether the agency's decision was reasoned, and we defer to the agency's expertise and discretion").

An agency may forgo preparing an EIS and issue a FONSI if it "concludes that the [proposed] action will not have a significant effect on the human environment." *Id.* at 1261. In determining the significance of proposed action on the environment, an agency considers the action's "context and intensity." 40 C.F.R. § 1508.27. Among the factors affecting "intensity" relevant to this review are effects that are "individually insignificant but cumulatively significant," effects on "unique characteristics" of the project area such as "ecologically critical areas," effects that may be "highly controversial . . . highly uncertain or involve unique and unknown risks," and the degree of effects on "endangered and threatened species." 40 C.F.R. § 1508.27(b). The existence of an effect alone does not necessarily trigger the obligation to conduct an EIS; the "relevant analysis is the *degree* to which the proposed action affects a listed factor." *Conner*, 920 F.3d at 1261 (emphasis in original) (quotation marks and citation omitted).

WildEarth challenges the FONSI with respect to five significance factors, arguing that the PDM activities: (1) have a cumulatively significant impact on target predator populations; (2) adversely affect public health and safety; (3) harm land areas with unique characteristics; (4) have highly controversial and uncertain effects; and (5) have an adverse effect on threatened or endangered species. WildEarth alleges that these significance factors individually and cumulatively demonstrate the need for an EIS. The Court will address each factor in turn.

### 1.   Cumulative Impact on Target Predator Populations

WildEarth first argues that when considering the proposed take by WS-Colorado of target predators combined with killings from other sources (*e.g.*, hunters), the cumulative impact on target species populations would be significant thereby harming the environment. (ECF No. 47

at 35.)

WS-Colorado's analysis of the impact of the proposed PDM action determined that it would not significantly reduce the population of predatory animals.  Specifically, that the cumulative take of black bears, coyotes, and mountain lions was a very small percentage and was well-within population sustainability rates.  (AR 143-44.)  The EA cited various studies to show that these predators can sustain certain harvest levels without significant impact to their population and overall survival.  (AR 142-180.)  In determining the impact WS-Colorado's lethal predator management activity has on each target predator population, the EA accounted for hunting and other man-made sources of mortality in addition to WS-Colorado's take.  This is particularly useful in finding no cumulative significant impact on the environment in the EA. *See Sierra Club v. U.S. Fish & Wildlife Serv.*, 235 F. Supp. 2d 1109, 1132 (D. Or. 2002) (finding that an EIS was required in part because the EA failed to include cumulative impact analysis addressing the total mortality rate of the target species).  Also, of note, the EA anticipated the potential for an increase in the number of coyotes, black bears, and mountain lions killed by WS-Colorado and determined that the cumulative take would still remain within sustainable harvest rates.  (AR at 148, 159, 162-63.)

Here, coyotes, which comprise the majority of predators killed by WS-Colorado because of the species' abundance in Colorado, have a long-term sustainable harvest rate of 60%.  (AR at 144.)  WS-Colorado takes an average of 1.35% of the coyote population in Colorado from its PDM activities.  (AR at 146.)  The EA assessed the cumulative take of coyotes, primarily those also killed by hunters, in determining the cumulative take is on average 32% of the population, well below the sustainable rate.  (AR at 144.)  Thus, WS-Colorado concluded that its PDM activity would have no significant impact on the coyote's sustainability in Colorado.

Likewise, WS-Colorado's take of black bears does not significantly impact the population. Studies in the EA revealed that the long-term harvest rate for black bears is 14%. (AR at 159.) On average, WS-Colorado kills 0.4% of the black bears in Colorado. (*Id.*) When considered in addition to the sportsman harvest of black bears, the cumulative take of black bears is on average 7%. This is well below the sustainable harvest threshold and, as a result, would have a low impact on the species.

Similarly, WS-Colorado's take of mountain lions does not significantly impact the population. The EA contained studies from other states showing that the mountain lion population has the capacity to rapidly replace annual losses under 30%-50% removal. (AR at 161.) Even at the highest end of that harvest range, studies indicated that the mountain lion population would recover within three years. (AR at 163.) From 2012 to 2016, WS-Colorado took on average 0.21% of the mountain lion population in Colorado. (*Id.*) The proposed cumulative harvest of mountain lions is well within sustainability rates. In all, the EA shows that the cumulative impact on coyote, black bear, and mountain lion populations would not be significant. Thus, WildEarth's argument as to this factor does not show that WS-Colorado is required to prepare an EIS.

2.  Human Health and Safety

WildEarth next argues that WS-Colorado's PDM program may have significant effects on public safety, particularly because it permits the use of a lethal gas discharge device called a M-44.[6] (ECF No. 47 at 37.) The EA addressed the potential and actual effect M-44 devices have on human health and safety as well as on the environment. (AR at 227.) Between 2012 and 2016, WS-Colorado used M-44 devices to take on average twenty-six coyotes and one red

---

[6] M-44 devices are spring-activated devices which deploy a sodium cyanide capsule when activated. (AR at 360.) These devices were developed for the lethal removal of coyotes and other canine predators. (AR at 359.)

fox annually.  (*Id.*)  The EA explained that WS-Colorado does not use M-44s on public lands, no humans or pets were exposed to M-44s used by WS-Colorado between 2012 and 2016, and WS-Colorado's annual take of predators with M-44s represented 0.2% of those taken nationally by the device.  (*Id.*)

WildEarth points to various instances where humans or pets were exposed to sodium cyanide because of contact with M-44s.  (ECF No. 26 at 11-12.)  The most recent of such instances occurred in 2000, when a domestic dog was killed in Colorado after triggering an M-44 device set on private land.[7]  (*Id.*)  Tragic events like this certainly raise concerns about the humaneness of using M-44 devices to mitigate predation.  But, to prevent them from occurring, for many years WS-Colorado has followed a comprehensive use and restrictions directive when utilizing these devices.  (AR at 11437.)  This directive limits M-44 use to only on private lands with the landowner's permission and requires that, whenever a device is set, it be accompanied by conspicuous, bi-lingual warning signs to alert people of its presence.  (AR at 140.)  Additionally, research in the EA demonstrates WS-Colorado has had a successful track record of using M-44s since 2000.

These rigorous precautionary measures coupled with WS-Colorado's successful implementation of the device over recent years indicate that the EA rationally concluded WS-Colorado's use of M-44s for PDM does not pose a significant risk to human health and safety. *See, e.g.*, *Cascadia Wildlands v. Williams*, 251 F. Supp. 3d 1349, 1362 (D. Or. 2017), *aff'd sub nom. Cascadia Wildlands v. United States Dep't of Agric.*, 752 F. App'x 457 (9th Cir. 2018) (explaining that the EA "rationally concludes that the risks to public health and safety are not significant" where the EA discusses the use of lethal predator management and explains that

---

[7] Based on the AR, this was the last time a M-44 killed a domestic animal in Colorado.

shooting is highly selective, that traps and snares would be surrounded by warning signs and that each of these activities occur in relatively remote areas with low human presence).  Thus, WildEarth's argument as to this factor does not show WS-Colorado was required to prepare an EIS.

　　　　3.　　Ecologically Critical Areas

WildEarth next argues that WS-Colorado's proposed program may be implemented in areas with unique characteristics which indicates there may be significant effects to the environment such that an EIS is required.  (ECF No 47 at 32.)  In response, WS-Colorado asserts that the mere possibility that PDM activities could occur near Wilderness Areas ("WAs") does not require it to prepare an EIS.  (ECF 48 at 36.)

As discussed previously, the potential of a project "to affect one of these factors does not require an agency to prepare an EIS.  The relevant analysis is the degree to which the proposed action affects this interest, not the fact it is affected."  *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Engineers*, 702 F.3d 1156, 1180 (10th Cir. 2012) (explaining that plaintiffs' "attempt to create a per se rule that any potential impact to drinking water, however minor, requires preparation of an EIS is thus unconvincing").

As WildEarth posits, killing predators such as black bears, coyotes, and mountain lions found in WAs may impact the natural condition of these lands by depriving visitors of the opportunity to view these animals in their biological habitat.  However, the degree of this potential affect is minimal based on a series of precautionary measures WS-Colorado uses to protect the environment.  First, the EA explained that the amount of PDM activities expected to occur in designated WAs "is either none, or so minor that the effects of any of the alternatives that involve WS-Colorado lethal work would not likely be significantly different from the effects

of a 'No Control in Wilderness Areas' alternative." (AR at 132.)  Second, in the rare instance where WS-Colorado's program occurs on designated WAs it is "only when and where requested by the land management entity." (AR at 140.)  Any such assistance is conducted in accordance with all guidelines and regulations applicable to WS-Colorado and the land management agencies. (AR at 141.)  These guidelines prohibit certain predator management methods and specify certain time periods when these activities may occur to ensure that the activities do not conflict with public enjoyment of the land. (*Id.*)  Third, WS-Colorado strives to protect the physical environment by limiting vehicle access in WAs, restricting it to existing roads and strictly prohibiting the use of M-44s. (*Id.*)  Finally, before conducting any PDM activities, WS-Colorado consults with public land management agencies to develop appropriate work plans to mitigate disturbances to the public's use and enjoyment of WAs. (AR at 472.)  Accordingly, WS-Colorado had a reasonable basis for its conclusion that its PDM program would not have a significant impact on the unique characteristics of wilderness lands.  Thus, WildEarth's argument as to this factor does not support that WS-Colorado was required to prepare an EIS.

### 4.   Highly Controversial and Uncertain Risks

WildEarth next argues that the proposed PDM program poses highly controversial and uncertain effects and involves unique and unknown risks which require preparation of an EIS. (ECF No. 47 at 40.)  WS-Colorado disputes this, arguing that the risks are not highly uncertain because it has utilized these PDM techniques for decades. (ECF No. 48 at 39.)

Highly controversial effects require more than public opposition to proposed action; there needs to be a "substantial dispute as to the size, nature, or effect of the action." *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002).  Highly uncertain effects are those which may be resolved by the further collection of data, or where the additional

data may "obviate the need for speculation." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) (quotation marks and citation omitted). It is important to note that the word "highly" is used to modify "controversial" and "uncertain" in the NEPA regulations, which means "that information merely favorable to [WildEarth's] position in the NEPA documents does not necessarily raise a substantial question about the significance of the project's environmental effects." *Native Ecosystems Council,* 428 F.3d at 1240 (explaining that "[s]imply because a challenger can cherry pick information and data out of the administrative record to support its position does not mean that a project is highly controversial or highly uncertain"). Thus, "something more must exist for [a] court to label a project highly controversial or highly uncertain." *Id.* WildEarth fails to provide something more here.

Turning first to whether the proposed program is highly controversial, the EA discussed scientific articles which doubt the efficacy of lethal predator control methods and their impact on predator populations. These articles clearly questioned the use of lethal predator damage techniques, and while they do not substantially dispute the size and effect of WS-Colorado's program, the mere existence of competing, scientific views indicates that there is some controversy surrounding the proposed program. Citizen groups and individuals disputed the effect of the proposed lethal PDM action, raising concerns about the impact killing predators may have on their enjoyment of a given species in its natural habitat. This dispute, however, is not substantial as data contained in the EA makes clear that the number of predators taken by WS-Colorado will not have a significant impact on target predator populations, preserving an abundance of animals for future viewing enjoyment. While killing animals is inherently controversial, there needs to be more to demonstrate that WS-Colorado arbitrarily decided its PDM activities are not highly controversial.

To make this showing, WildEarth relies on two cases which involved highly controversial agency programs.  WS-Colorado maintains that this case differs from those where the controversy factor is implicated, primarily because the citizen groups and individuals who objected to the proposed action have not raised a substantial dispute to the program's efficacy.

In *W. Watersheds Project v. USDA APHIS Wildlife Servs.*, the court found that the "factors of controversy, uncertainty, and unique lands" all weighed in favor of preparing an EIS. 320 F. Supp. 3d 1137, 1150 (D. Idaho 2018).  There, "several federal agencies with long experience and expertise in managing game animals and protected species . . . expressed serious concerns about [the] proposed expansion of lethal predator control." *Id.* at 1147.  This proposed expansion included "killing native wildlife at the request of the [Idaho Department of Fish and Game] to benefit other desired wildlife species," and a "new proposal to kill ravens and other predators." *Id.* at 1140–41.  The EA at issue in *W. Watersheds Project* examined various alternatives and decided to discontinue the agency's existing activities to include a more expansive list of target predators as well as to allow other "unidentified predator control activities." *Id.* at 1140.  Ultimately, the court found the agency's decision to forego conducting an EIS was arbitrary and capricious, reasoning that the agency provided unconvincing responses to criticism from the Bureau of Land Management, the Forest Service, and the Idaho Department of Fish and Game to the proposed action. *Id.* at 1150.  The court finally noted that it was reviewing a "unique case" and that it was "rare . . . to encounter such an unanimity of critical comments from other agencies." *Id.*

The chief concerns present in *W. Watersheds Project* are absent from this case. Particularly, here, there is no unanimous criticism from multiple government agencies with expertise in the controversial areas of the proposed program.  Instead, various federal and state

agencies actually collaborated with WS-Colorado to ensure the EA was as comprehensive and thorough as required under NEPA in addressing PDM alternatives.  In this regard, the same agencies that opposed the proposed action in *W. Watersheds Project* supported WS-Colorado's finding of no significant impact.  Moreover, the preferred alternative here is to continue the current program, or no action, and does not implicate new or unidentified predator control techniques that posed controversial and uncertain effects in *W. Watersheds Project*.  For these reasons, *W. Watersheds Project* is distinguishable from this case.

WildEarth also argues this matter is analogous to *Wildlands v. Woodruff*, 151 F. Supp. 3d 1153 (W.D. Wash. 2015).  There, the court found that, among others, the "highly controversial" factor favored preparation of an EIS.  *Wildlands*, 151 F. Supp. 3d at 1165.  In *Wildlands*, the highly controversial factor was triggered because the agency "summarily dismissed" a "disagreement among experts regarding the effectiveness of removal to address depredation." *Id.*  Unlike the agency in *Wildlands*, WS-Colorado discussed opposing viewpoints on the efficacy of lethal PDM methods at length in the EA.  The Court recognizes that there exists some controversy as to the effectiveness of lethal control methods as indicated by the sheer volume of scientific research opposing lethal PDM in the record.  However, WS-Colorado was not unreasonable when it decided that any controversy which exists is slight and amounts to a disagreement among experts.  WildEarth fails to show that WS-Colorado's explanation for its decision runs counter to the evidence before it or that it failed to consider an important aspect of the controversy.  Thus, WildEarth's argument as to this factor does not demonstrate WS-Colorado needed to prepare an EIS.

Turning next to whether the proposed program may have "highly uncertain" effects on the environment, WS-Colorado points out that it is not engaging in a new activity with unknown

effects on the environment.  (ECF No. 48 at 39.)  WS-Colorado maintains that it has employed

these PDM techniques for decades and has detailed data tracing their effect.  The record supports

this position.  (*See, e.g.*, AR at 26, 30, 147-48, 158-59, 161-62.)

Nevertheless, WildEarth claims that the proposed PDM activities contemplate highly

uncertain effects because when a trap or poison device is placed "on the landscape, it is unknown

what the result of that lethal device will be."  (ECF No. 47 at 41.)  To a certain extent this is true

as it would seemingly be difficult to predict the precise result of some PDM techniques, but the

fact remains that these devices are used to kill target predators and that WS-Colorado's use of

these techniques over recent years has had no significant impact on target animal populations or

on the environment.  WS-Colorado considered information concerning the use of lethal PDM

techniques—in particular, M-44s—in the EA to determine that the impact on non-target species

is negligible and that there is no impact on human health and safety from these control

techniques.  (AR at 227, 471-73.)  A discrepancy in population estimates based on varying

studies does not amount to highly uncertain effects on animal sustainability projections.  WS-

Colorado relied on the most accurate data available, and where studies varied, it chose the

lowest, most conservative rate to estimate populations.  (*See, e.g.*, AR at 147-48, 158-59, 161-

62.)  The intensity of uncertainty is low, and while these effects may not be favorable to

WildEarth's cause, they are somewhat certain.  Thus, WildEarth's argument as to this factor does

not show that WS-Colorado was required to prepare an EIS.

### 5.    Endanger Protected Species

WildEarth lastly argues that WS-Colorado's PDM activities may have significant effects

on threatened or endangered species.  (ECF No. 47. 43.)  WS-Colorado disputes this, claiming

that the potential for this effect is too attenuated to trigger the obligation to prepare an EIS.

(ECF No. 48 at 43.)

In the EA, WS-Colorado considered the degree to which its preferred PDM program might affect threatened or endangered species, highlighting various measures to reduce any potential impact on eight protected species. (AR at 137-39.) In conjunction with the U.S. Fish and Wildlife Service and Colorado Parks and Wildlife, WS-Colorado has taken and will continue to take preventative measures to avoid any accidental killing or capture of threatened or endangered species. (AR at 473.)

WildEarth is particularly concerned with the potential effect on Canada lynx because, in the past, Wildlife Services accidentally took a lynx when targeting other species. (ECF No 47 at 44.) WildEarth hangs it hat on the only accidental take of a Canada lynx across the nation in the past thirty years, which occurred in Idaho, to suggest that endangered species are at risk under the proposed PDM program. (AR at 191.) While WS-Colorado's parent agency was responsible for this accidental take, the lynx was captured outside its typical habitat and was later released alive. (*Id.*) In the EA, WS-Colorado determined that because Canada lynx live in "high elevation spruce-fir habitats rarely utilized by livestock, it is extremely unlikely" that the proposed program would impact lynx. (*Id.*)

Based on studies included in the EA and ongoing efforts with government agencies tasked with protecting these species, it is unlikely that WS-Colorado's PDM program will adversely affect the Canada lynx or other recognized endangered or threatened species. Thus, WildEarth's argument as to this factor does not support that WS-Colorado was required to prepare an EIS.

In light of the record as a whole, WS-Colorado's evaluation of the significance factors was not arbitrary or capricious. WildEarth has "failed to show what could be accomplished

through an EIS" and the Court finds no clear error of judgment in WS-Colorado's conclusion that the effects of the PDM program are not significant enough to require an EIS. *Conner*, 920 F.3d at 1264.

## IV.   CONCLUSION

Based on the forgoing, it is ORDERED that

1.  WildEarth's First Amended Petition for Review (ECF No. 26) is DENIED;

2.  The Clerk shall enter judgment in favor of Respondents and against Petitioners; and

3.  The Clerk shall close the case.

DATED this 10th day of March, 2021.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge